v. James, case number 24-849. Good morning, Your Honors. May it please the Court, my name is Julian Broad and I represent Appellant Matthew James. I'd like to begin by addressing the jury exposure issue and then move on to the sentencing issue and the financial penalties. The jury at Mr. James' fraud trial was exposed to one and likely several transcripts of unadmitted calls. This Court's precedents make clear that when such an exposure occurs, the Court should make an inquiry to determine the nature of the exposure and its extent. Is this analysis subject to harmless error analysis? In other words, even if there was not an inquiry, and there was not from here apparently, we can look at the nature of the other evidence and determine that the introduction of these two or three exhibits was harmless. Yes, Your Honor. Harmless error analysis would apply here, albeit modified because of a presumption of prejudice associated with jury exposure to extrinsic evidence. But on that point, I would note that the Court's review of this is handsprung by the fact that the Court made no inquiry whatsoever of the jurors to determine the transcripts that were reviewed, the extent to which they were used in jury deliberations, and also because this exposure was discovered before the verdict, the Court should also have inquired into its effects on the jurors and whether the jurors could remain fair and impartial and put it out of their minds. And it's unsurprising that was the Court's first instinct here. That's at transcript page A402. The government, however, persuaded the Court to take a different path, to give merely an instruction. But that would not have been sufficient here, given all of the unanswered questions. The instruction that came out was almost completely garbled, and I think would have been largely unintelligible for the jurors. So on that basis, we think there needs to be a new trial. There was never an instruction in the first place, was there, when these binders were handed out to the jurors, that they should not look at anything until and unless a recording was being introduced, at which point they would be told which transcript they should look at. Well, Your Honor, there were a couple of instructions during the course of the trial. The defense actually, I think, the defense, there were at least two, I think, instructions in which the defense... I thought that was a softball helpful question. I was trying to determine whether or not the judge did what, in my experience, judges typically do, which is to instruct the jurors that if they had a binder there, they're not supposed to look at anything. Am I wrong? No, I appreciate it. You're about to tell me that, no, there wasn't, but there was something that was just as good? The judge did tell the jurors to focus on the transcript that pertained to the particular court. But it's clear that this jury, at least one juror, did not follow that instruction, which is also what gives us pause about whether the jury was capable of following the very garbled instruction that's set to A409. Well, the next one is not a softball, a friendly question, exactly. But in terms of the prejudice from this, how do you deal with the fourth jury note? Indeed, the whole path of the jury notes seemed to concentrate very specifically on conversations between the defendant and one of his employees, which would not suggest that they were looking for or had knowledge of or cared about Government Exhibit 3, the transcript of the, to my eyes, much more prejudicial conversation of Ms. Brunner with, was it Aetna? With one of the insurance companies. With one of the insurance companies. And Judge, I would agree with you that transcript number 3 was by far the most inflammatory and prejudicial. But I would disagree that the jury was, that we know that the jury was not interested in that transcript. You know, now, it's always delicate. I understand that the burden is on the government to show an absence of prejudice. At the same time, it's very hard to show an absence without focusing on what is or is not prejudiced, right? So is there any actual affirmative evidence that would suggest that a juror has observed Exhibit 3? Well, I would say it's the first jury note requesting one, two, three. One, two, or three, that is. And the fact that the district court itself, when it gave its instruction, which was mostly gullible, at one point it was not. But the district court instructed the jury, I hear that you're asking for one, two, and three. So I think this is uncertain. It's possible that the jury specifically wanted to see one and two, but didn't need to see three, maybe. But we think these are unanswered questions. If I could, I'd much want to move on to the sentencing issues, because they're very important on this appeal. With respect to the ARDAP, First Step Act, the district court added two years to Mr. James's sentence because of its speculative belief that Mr. James might be able to participate in programs under the First Step Act and in ARDAP. This was completely improper. The Section 3553A factors do not direct the district court to consider the possibility of early release. The district court has absolutely no control over whether Mr. James may participate in ARDAP or in the First Step Act program. It is entirely within the Bureau of Prison's discretion. And indeed, under the current regulations, which could certainly change with changes in administration, but under the current regulations, if Mr. James were to get sick or to be segregated, he would be unable to participate in classes. He's not going to get the benefit of those credits. So we would submit that it is fundamentally improper under the statute, and certainly under TAPIA v. United States, which we cite in the statute in our briefs, for the district court to consider the possibility that... Why is this exactly... So the TAPIA argument, but thanks to Debra Robertson, isn't exactly what TAPIA, I think, certainly covered or had in mind. Can you explain a little bit more carefully how TAPIA applies here? I was thinking that there was a reference by the court before she actually imposed a sentence to ARDAP, but in the imposition of sentence, there's no reference to that statute. Well, I think TAPIA applies in two ways here. First, because... And of course, TAPIA wasn't limited to ARDAP. It said that rehabilitation cannot be a guide. But it applies in two ways. Firstly, because TAPIA says, quite broadly, that if Congress were meant to allow courts to base prison terms on offenders' rehabilitative needs, it would have given the court the capacity to ensure that offenders participate in prison correctional programs. Of course, that's not the case. Indeed, the defendant in TAPIA didn't actually end up participating in ARDAP. And the court goes on to say that incapacity indicates that Congress did not intend courts to consider offenders' rehabilitative needs when imposing prison sentences. This isn't like considering rehabilitative needs, is it? I mean, what the judge did here was partly saying, I think this person needs to have certain kinds of rehabilitative programs, and therefore I'm going to send him to prison for a long time so that he can get them. There's nothing like that going on here, right? Well, Judge, I think it is a very fine distinction, if it's a distinction at all, between saying, you will participate in these programs, I think you will, and therefore I'm sending you to prison for a longer time, and I want you to participate in the programs. I thought you were going to tell me that it is distinguishable, except it's worse in this case, because it's not a question of the judge, out of misguided, perhaps benevolence, thinking, I'm going to make sure this person gets rehabilitated. It's kind of holding the possibility of his participation in rehabilitative programs against him. I would agree with that, Judge. And if I might, I know I'm out of time. That is why. We'll give you a little bit of time. But that's why I ask the question, Tapia doesn't contemplate this. So, as Judge Lynch indicated, really Tapia contemplates enabling a prison defendant to complete a rehabilitation program and to help that person rehabilitate, and that was misguided, as the Supreme Court explained, but this is not, it's just using a statute in a particular way to arguably hurt. So, is there a case that you're aware of, anywhere in the country, where this type of situation has arisen and has been described as a Tapia problem, for lack of a better term? Your Honor, we're not aware of a case on force with this case, and I think the reason for that is, first, because the First Step Act is relatively new, and also just because I think judges are not doing this. I just want to highlight just how unusual the sentencing proceeding and the advocacy was there. The government submitted to the district court that she should sentence the defendant to more time than she actually intended the defendant to serve, on the basis that the defendant could then move to compassionate release, if he wasn't released early. But the district court believed, incorrectly, that the defendant might be able to halve his sentence. That's an independent error that I think requires resentencing here. If I could just move on and speak briefly about the forfeiture and restitution. And the court has the guidelines arguments in the briefs. On forfeiture, it's undisputed that the government presented evidence concerning only a fraction of the tens of thousands of claims submitted by Mr. James' office during the relevant period. And it's also undisputed that within that limited, that fraction of the claims that was discussed at trial, there were legitimate claims, there were claims as to which there were no problems, there were doctors as to whom Mr. James' relationship had no taint of fraud, even alleged fraud. And the court made a finding at the first sentencing hearing that, she says, I cannot presume that all the claims submitted were fraudulent. I will make a finding, this is at A590, that not all of the claims were false, fraudulent, etc. There were some that were legitimate, she says again, on the next page, there were some that were, there were some legitimate claims in there, and she says she is going to reduce the lost amount, at least for purposes of the 3553A factors, by 30 million, so that it would be 33 million. And then at the second sentencing proceeding, the court reverses course completely and decides to impose forfeiture of the entirety of Mr. James' revenues during the relevant period. There's no basis for this, and although it certainly isn't our position that the court has to account for every dollar and cent and, you know, it's not that, but the court has to make a reasonable estimate, given the available information. They did not even try to do that here. Well, somewhat ironically though, and I certainly take your point, that the forfeiture judgment, which is what, 63 million dollars? 63 million. 63 million was based on the totality of his profits, and I take your point that the totality of his billings, from which those profits came, were clearly not the proceeds of fraud. Whether it's only a million dollars that was not fraudulent, or 60 million that's not fraudulent is difficult to figure out on this record, but certainly some of that was not fraudulent. But then you haven't spoken, and I suppose you will, to the restitution judgment, which of necessity almost dwarfs the forfeiture judgment, because the restitution is calculated by the total loss to the insurers, rather than the amount of profit that inured to the defendant. So it's kind of gross revenues rather than net revenues to him. And on that calculation, there seems to have been a much more careful attempt to sort out the fraudulent ones, because it was only particular types of bills that were considered, and that was not even all of the types of fraud that were committed. And once again, I imagine you're going to tell me that, well, it's not necessarily the case that every time that the modifier is used, or every time that something else happens, but there was much more focus on bills that had instances of things that were frequently done fraudulently. Is that fair to say? Well, Judge, I would agree with you to the extent that more effort was put into evidencing the restitution amount, more effort on the part of the government. But it wasn't better effort, it wasn't more accurate. And so just to illustrate the point, the impersonation spreadsheet, which is vast, thousands and thousands of lines, the government put on that spreadsheet every claim associated with every patient who Mr. James or his employees ever impersonated, regardless of whether those claims were paid out before the impersonation or afterwards. This is a basic point. So you're saying that if the amount, and I think, I'm going to have to hear from the government about this, but it certainly sounds right, that if a bill was submitted and the insurer paid a part of it before there was an impersonation, then the specific fraud that Mr. James applied, which was to call the insurer, pretend to be the patient, and say you've got to pay this because otherwise the hospital is going to make me pay it when that was not true, right? So that fraudulent effort could only have elicited an increase in the payment and could not have been the cause of the original submission of the bill. That's exactly correct, Your Honour, and it's even worse than that because for some of the patients, including the patients who testified at trial, so take the MBA star, Marcus Smart, who testified at trial. Mr. James impersonated him, that was conceded. However, that impersonation did not result in any further payment. It was unsuccessful. I think Mr. James called several times pretending to be Marcus Smart. So how could that be the subject of a restitution? That's our point, Judge. And just to tie this back to forfeiture, and then I'll sit down if there are no further questions, but again, we don't think it has to be absolutely exact, but it has to be a reasonable extrapolation from the available evidence. A good example of how that might be done in a case like this is United States v. Uden. This was a case in 2009. Judge Stack sat on the panel in that case and joined an opinion by Judge Katzman. This was a case in which it was a food stamps for cash fraud case. And there was very limited evidence. There was limited evidence as to how much the grocery store's revenue was fraudulent and how much was actually real transactions. There's much more evidence in this case because medical billing is a record intensive area. But in that case, the court said, well, the fraud typically happened in transactions over $50, but it wasn't every transaction over $50. And we can tell from surveillance footage and from inventory records that some people were buying food when they spent $60 or $70. But I think that it's about 60% of the transactions over $50 that were fraudulent. And the court said, you know, we know that's not dollars and cents exactly the number, but it's close enough. That's what should have happened here. What we don't have here is a kind of sampling. Is that really what you're suggesting should have been done or that we should say should be done on remand, that there should be like a random sampling of all of a given category of bills and see what percentage of those can plausibly be attributed to fraud? Well, this isn't necessarily a helpful answer, but of course it's the government's burden to show the amount of forfeiture. You want a slightly more precise division between what's legitimate and what's illegitimate and what's traceable to the fraud and what's not. What I would say, Judge, and we think that the government knew about its burden. Let me put it another way. Would you have an objection to that kind of approach to calculating either the forfeiture or the restitution bill? And if so, what would that objection be? Why would that not be a reasonable way of doing something like what was done in the food and spam case? I think I want to make sure I understand what you're proposing. It sounds like you might put in an opinion. I'm just trying to figure out. We have these bodies of law, right? The court is supposed to try to make a reasonable effort to figure out what the right restitution is, but it need not be dollar and penny specific. We're looking for a reasonable approximation. And I'm trying to find out whether you have an objection to or you think it would be improper for a court to direct the government to get some expert accountants to take a random sampling of whatever category of bill they allege were mostly fraudulent and then drill down deeply into each particular bill in that sample and try to determine what percentage of the total bills in that random sample were fraudulent and then apply that percentage to a grosser category. As a general matter, Judge, that would be proper. We believe that in this case, because the government knew of its burden, it did not put in an expert below. You shouldn't have to pay anything ever, despite all the fraud, because on the first draft, they got this badly wrong. Well, Judge, it wasn't the first draft. It was the first submission to the court. But that certainly isn't our position. You agree that there's some forfeiture. As I understand it, you agree that there's a legitimate forfeiture amount. You just think that this is grossly inflated because it did not distinguish between legitimate revenue and so on and illegitimately derived funds. Is that right? That's correct. And the defense put in an expert report at sentencing, which the court did not reject. The court accepted that the expert was well qualified. The government did not choose to put in an expert. And so, no, we're not saying that there should be no forfeiture amount, but we do think the record should be closed at this point. Right. Well, what would that mean? That the court would look at the trial evidence and the defense expert. It would look at the record before it, and it would enter a forfeiture amount. We would submit that the correct forfeiture amount would be the – so the defense expert looked at the evidence and took it in the government's favor and said that 20% of the bills, looking at the eight or nine patients who testified at trials, that those would not have been paid. And that's as far as we should go in terms of the fact of the matter? That is – we think that the district court should be limited to the record before. You want to freeze the record? We want to freeze the record, yes. I understand. So you've kept you well past your time, but you've answered the question. So you've reserved two minutes for rebuttal. We'll hear from the government. And I understand that that's a split argument by the government. Yes, Your Honor. Good morning. May it please the Court, Antoinette Rangel for the United States, and I'm joined by my colleague, Assistant United States Attorney, Catherine Mirable. I'll address the First Step Act argument and the request for remand to a different judge, as well as the unadmitted transcripts argument. Ms. Rangel, were you part of the trial team here? Yes, as well as Ms. Mirable. Ms. Mirable, I saw her name in the transcripts. Yes. And with the Court's permission, we ask that I take six minutes for my arguments and four minutes for Ms. Mirable. The District Court had wide discretion on how to address the jury's exposure to unadmitted transcripts. Here, this Court's inquiry must focus on any potential prejudice from the jury's exposure to Government Exhibits 1 and 2. But before I turn to why no prejudice exists with respect to the jury's exposure to those transcripts, I want to discuss why, as Judge Lynch pointed out, there's no affirmative evidence whatsoever in the record with respect to Government Exhibit 3. Well, there is. They did ask for 1, 2, or 3, or refer to 1, 2, and 3. And it's the Government's position that the reason that they did that is when the binders went back with them, it started at Tab 4. And so, just logically, they asked for Government Exhibits 1, 2, and 3. In the record, there's no evidence that they had any idea of the substance of the transcripts. And as the Government represented at trial, that transcript was never in the binder because the only transcript... How do we really know that, you see? I mean, I understand that, I guess it was Ms. Naropoli who made the representation, but, you know, if I were cross-examining a witness who had made that representation under oath, the very first question I would ask is, did you personally put together each and every one of those binders such that you can give firsthand testimony to what was in them? Now, I could have answered yes to that when I was a prosecutor because we didn't have paralegals and we didn't have second and third shares on most trials. And I remember marking Exhibits, Government Exhibit 1, for identification and doing all this work myself. That wasn't the way it was done in the early 2000s when I was a trial judge. So, I'm not sure, you know, I mean, I did the last one to suggest that, you know, we think the prosecutor is lying about one of these things. But how do we actually know what really happened? And how do we actually know what was and was not in the binders and that there wasn't some mistake in putting it together? And why, after all, is Tab 1, Government Exhibit 1, and Tab 2 is Government Exhibit 2, but Tab 3 is something else? Why wouldn't the Tabs correspond? And since they didn't, wouldn't that suggest the possibility that some staff member could have made a mistake? There was actually never even Tab 3 in the binders. This was Tab 1, the representation. Was that representation actually made, though? That there was Tab 1, Government Exhibit 1, Tab 2, Government Exhibit 2, and then Tab 4, Government Exhibit 4, and that's all it was? That's the way it was presented to the jury? That's what the jury received. Well, no, no, no, no, no, no. You're telling me now that that's what happened. I'm saying, was that the content of the representation that was made to the judge because I didn't actually see it that way and I may have misread it. What we say specifically in the record is that Government Exhibit 3 was never in the binders. Having done the trial below with Ms. Mirable, the only exhibits that were in the binders were… Those to which the defense did not object, and they had an objection, a very big objection to Government Exhibit 3.  And so, you know, it was a very… But that doesn't say anything about, you know, what the… I thought there was some suggestion, in fact, that somehow the Tab number is where it was at 12 here and it didn't correspond to the exhibit numbers. No, no. Again, there was only 1, 2, and then it skipped to 4, but there was never a Tab 4. Is that something… Is that even a representation that was made to the district court or is this just another representation unsworn to us outside the record as to what was there? It was not on the record. It's something that we discussed with defense counsel when we, you know, showed them the binders and said these are all the unobjected-to exhibits and they had the opportunity to review them, and that's why they were able to be with the jury because they were unobjected to. And as Your Honor pointed out, Government Exhibit 3 was vehemently objected to because of the call between one of the defendant's employees and an insurance company. I take it that it would be too much to hope that a copy of the binder as it was presented to the jurors during the trial was preserved as a court exhibit or even whether a copy of the binder that the jurors had with them in the jury room was preserved as a court exhibit. No, those were not preserved as court exhibits. Then that's the problem. That's why we're here. Could I ask you about this jury instruction, the supposed curative instruction that was presented because I think Mr. Brock's characterization of this as garbled and incomprehensible is at most very slightly overstated because I could not make head nor tail of this instruction. First of all, one thing it never does, correct, is say to the jurors, after saying that you're not supposed to put anything you saw of that sort out of your mind, there was not a question addressed to the jurors at large, can you do that? If anybody can't do that, could you raise your hand or send me a note or something? That was not done, was it? It was just if you have any questions, contact me. So the government would argue that if you have any questions, is the court inviting the jury to say if you have any questions on this matter, if you feel like you can't be fair and impartial, please contact the court. And I will note that this is a very So if I said to someone, you might inquire if you had any interest in whether I was giving a party, that I was inviting you to the party? I take Your Honor's point that it was not as direct as it maybe could have been, but I do think the district court, in her discretion, decided that that was the best court. And what do we make of the instruction that says, if you think you saw something, you didn't? That's like false, right? I mean, you think that a juror who hears that is going to pay much attention to the rest of the instruction? That's a very peculiar thing to say. You didn't see what you saw. Well, I think the court's message to the jury was, like all other unadmitted evidence, you are to disregard this evidence, and to the extent you are unable to, please contact the court. And I think the district court, in its discretion, having interacted with this jury throughout deliberations, this is a quite prolific jury. It's a minor point, but still to tell people also, you should treat this evidence like the other evidence that isn't evidence because it's not evidence, is not the clearest way of sending a message, is it? Perhaps not, but I think given the jury's ability and all the other jury notes that it sent to the court, it sent nine different jury notes asking for particular exhibits, asking for clarification on legal concepts. I think the district court was well within its discretion to determine, okay, this is a jury who knows how to ask for what they need, ask for clarification, ask for additional information. And so to the extent that they feel like they can't be impartial if a certain few of them were exposed to these transcripts, that they could say, okay, I actually need to talk to the court about that because I can't be impartial. Your principal argument, as I understand it, was at least with respect to the first two exhibits on homelessness, right? Yes, Your Honor. Governments Exhibits 1 and 2 were duplicative of a myriad of evidence in the trial record. The Governments Exhibits 1 and 2 are the defendant trying to sue his employee and encouraging her to tell the truth, and defense counsel's argument that it obliterated any good faith argument. Well, the record was replete with evidence of the defendant's lack of good faith. And so if the jury was exposed to Governments Exhibits 1 and 2, that would be harmless. And that's regardless of arguably the error of not engaging in an inquiry. Correct. That's not what is required of the district court. Certainly there are cases, but the cases that are cited in the briefs are about juror misconduct. I think here the district court heard argument from defense counsel who was asking for an individualized inquiry and then from the government who opposed that and in her discretion decided that. Isn't this only not juror misconduct? Because the judge failed to give the instruction that I think should have been given, which is don't look at anything in this binder until and unless I tell you to? If that instruction had been given, then it would clearly be misconduct on the part of a juror to start browsing through the book, right? Correct, Your Honor. I think that throughout trial there were instances in which the court itself directed the jury to stick to the transcript, as well as the court. Maybe you can point to something very specific, but I read the briefs and the transcript references that supported what was in the brief. The instruction, which is, I think to a sophisticated mind, it might suggest that you don't look at any transcript that is not connected to a recording, but the instructions are basically in the form, are they not, of it's the recording that's the evidence. The transcript is just a help to you to follow what's being said. Yes, that is something that the district court repeated time and again. That was done frequently. Frequently, and in addition, when we were examining witnesses, we would talk about, I'll say government exhibit 18, and say the government exhibit 18 is in your transcript binder, so it's a signal to the jury that's the transcript that you're looking at. The jury does something that the juror in an ideal world or under the law should not have done. I suppose one would rightly say, I don't want to call that misconduct by a juror who might not know the rule because she wasn't told what the rule was, but why should that make a difference to whether the judge has to make an inquiry into whether and how the jury was contaminated? And by how, I don't mean questions about how much did you talk about this in your deliberation. I just mean asking each juror, did you see something in a binder? And if not, did someone tell you about something that was in the binder that was the subject of this jury note? Why would we care whether the juror who was exposed to that material improperly or incorrectly was subjectively culpable in coming by that information or not, when the issue is what is a judge required to do to ensure that the deliberations were not prejudiced? Well, again, I think after hearing argument from both parties, the judge decided that it was the best course forward to give the instruction rather than have it be exacerbated. Don't make a big deal out of this. It's a common reaction of judges that if we do some of these inquiries, it gives undue prominence to something that's best adjusted. Nothing to see here. Just put it out of your mind. That's exactly right, Your Honor. It could have been one or two jurors, and so by doing this it's the sort of least intrusive means to address the issue by giving the instruction, and then to the extent that a juror felt that they could not be impartial or have further inquiry on that, it could write back to the court. Well, when I say it could have been just one or two, it could have been just one or two who actually, maybe only one, who actually saw something in Exhibit 1, let's say. But when a jury note comes out saying, we would like to see the following, is that not significant evidence that it's very likely that everyone expressed some interest in seeing it, or at least even if only one person is affirmatively interested in seeing it, that everyone, so they rolled their eyes and said, yeah, here's this person making trouble again. We don't really want to go through all this trouble. We don't want to look at that stuff anymore. We're already convinced. But wouldn't that suggest that somebody said something about what they saw in Exhibit 1 that makes it necessary or desirable to look at it? Sure, but one juror could have said that, and then the jury could have agreed that we could inquire about it. But then once told to disregard it, the jury rendered a verdict right away. So once they knew that they were not to regard transcripts 1 and 2. I mean, 510, A510, which is the second note, strongly suggests that they all talked about it. Because it says, if so, is it possible that said transcript was inadvertently or mistakenly placed in the transcript binder, and 1 is crossed out, and 8, jerked. So the natural implications that they talked about it. But ultimately, again, they're relying on harmless error. Now, in the back and forth, obviously, well, I shouldn't say obviously, both sides had access to the binder. Is there any colloquy where the defense counsel says anything about the absence or presence of Exhibit 3? Not on the record, Your Honor. And how about the absence or presence of the first two exhibits, Exhibit 1 or 2? No. Okay, so it's silent. Yeah, correct. I'm happy to turn to the First Step Act issue, unless Your Honor has further questions. Very, very briefly, because you will pass your time. Yes, Your Honor. As Your Honor has pointed out, a district court has broad discretion to consider many types of information at sentencing. And here, the district court did not abuse its discretion in considering the implications of the First Step Act. At the first sentencing proceeding, the district court had a fundamental misunderstanding of the First Step Act, which information... Would you address the Tapia issue? Yes, I believe that, like Tapia and the other cases in which district courts have considered good time credit in fashioning a sentence, that it's appropriate because it's only, as the district court articulated here, it's only one factor that it's considering as it's assessing the 3553A factors. And I think that that's why it makes it appropriate in determining... But as I understand it, assuming that Tapia really applies here, using or relying on or resorting to or considering whatever the word is that you want to use, rehabilitative needs, however that goes, is improper. So the fact that you use it as one of many, many factors doesn't matter. But maybe I've misunderstood what Tapia means. You're telling me it's okay so long as it's part of a mosaic of different factors? I don't think that that's correct. Any factor that you consider could be the determinative factor in a particular case, right? But I think that's what the district court made clear here, that it was not the determinative factor, that it was not the sole consideration. But it is a factor. It is a factor, so why isn't that error? Why don't we assign error to that? Because I think it's permissible in terms of when the court is fashioning a sentence under the 3553A factors, it's considering how to afford adequate deterrence to the criminal conduct. Let me ask you the following. Judge says, oh, I'm considering 20 factors, including the defendant's race, but that's a small factor. Is that okay, or is that... When the rate... So, if you have... If you are considering a prohibited factor, then it seems to me to be the end of the inquiry. We don't even have to get into whether it's a determinative factor. That's just an inappropriate factor. That's what Fabio seems to suggest to me. Again, I think that going back to the district court's own words about the First Step Act, it's not saying that the district court is only considering the First Step Act. It's saying it's considering the possibility of the implications of the First Act. But along with... It's kind of troubling that the judge is about to pronounce sentence, and Larry and Jessica kind of says the word 10, and then the government jumps up and says, wait a minute, you're not thinking about this right. And then there's a whole big discussion, and the court then adjourns the sentencing so that there can be briefing about this very issue of what can be considered. And then at the end, when she comes back, she says it's 12. I think in the first proceeding, when the district court was talking about 10 years, it wasn't pronouncing the sentence. If it was, then we wouldn't be here because the sentence would have been pronounced. It didn't get fully pronounced, in part because the government had the wit to get up and say, wait, before you say that, consider this factor. Right, and I think the district court exactly did that because I don't think it would have even said 10 years if it had a correct understanding of the First Step Act, and I think that's why the district court wanted to understand and get additional... Well, are you saying that the judge was considering 10 years because she misunderstood the First Step Act, but then once she understood it, it came out 12? Isn't that what they're arguing? I'm only saying that that's one portion, one of the things that she considered in determining her sentence. I think when she ultimately pronounces her sentence in the second proceeding, she talks about all the... The totality of the sentence turns on the totality of the factors. I mean, if the other factors didn't get you at least to 10, we also wouldn't be here, right? Or at least we'd be here at a much lower level of sentence. So, of course, all the other factors play a role in the final judgment of a sentence, but I'm still concerned, and even if... You know, I could imagine an argument that it is appropriate to consider things like good time credits and paroleability and things like that. Back in those ancient times when we marked our own exhibits, before the Sentencing Reform Act, judges explicitly considered things like the parole guidelines and explicitly considered the fact that if you pronounced a nine-year sentence, the defendant would be eligible for parole after three years, and if judges didn't think that was a good idea, they might pronounce a larger number for the sentence to ensure that parole eligibility didn't come up until a third of a larger number. And I don't know of any case law that said they were doing something wrong when they did that. Now, but this is different, because in this instance, it seems to me, there is no... We're not talking about statutory eligibility for parole that clicks in at T1 or T2. We are talking about the possibility, the speculative possibility, that this defendant will have the opportunity to participate in certain rehabilitative programs. And if he doesn't, if he wouldn't have, if he never would have gotten into those programs in the first place, then he's just getting two years tacked onto his sentence based on the totally speculative possibility that if the sentence were lower, he might be able to, you know, get out earlier than the judge thinks appropriate. That seems... Even without reference to Tapia, that seems very... Doesn't that bother you? That what the consideration of this does is to add time to a sentence or at least suggest an argument for lengthening a sentence based on the possibility that if the sentence were lower, certain contingencies might come into play that would allow the defendant to take advantage of something that Congress would contend that he'd be able to take advantage of. Right, and I think that is what the defense counsel's suggestion at sentencing, that the court was doing that for the first setback, but time and again, when defense counsel suggested that the reason the court was, quote, adding two years, which I think is a characterization defense counsel is making, the court repeatedly said, I'm not adding two years because of the first setback. And in fact, you know, as I was pointing out, when she ultimately pronounced her final sentence, said the first setback is not the reason I'm doing it and talked about all the 3553A factors. So I think we take comfort in, you know, defense counsel pointing out that it's the first setback and the court saying, no, it is not the first setback. These are the reasons... You do seem to acknowledge that the RDBA was part of the consideration. I'm sorry, Your Honor. The rehabilitative portion was part of the... was something that was considered. Yes, it was something that the district court considered and... RDAP, yeah. Yes, RDAP and the first setback. Let me, before you sit down, can I just ask you about the leadership enhancement, which was not raised... That's Ms. Mirabla's argument. Oh, that's you. Okay. Yes. You can continue. Well, thank you very much. Thank you, Your Honor. I appreciate you sticking to the timeline. You answered our question. Thank you. Thank you. And I'll note for the record that I also used to put divot pads on my divots. Go ahead. Good morning, Your Honor. My name is Catherine Mirabla and I'm an assistant U.S. attorney in the Eastern District of New York and I'm addressing the sentencing enhancements as well as the restitution and forfeiture orders. And in particular, if you had a question on the leadership enhancement, the leadership enhancement decision by the district court should be affirmed. The defendant should be subjected to the four-level leadership enhancement. He was the sole owner and operator of his medical billing companies. He managed the daily affairs of the companies. He controlled all aspects of the companies. He hired and fired his employees. He reviewed every single claim that was submitted to the insurance company. I agree with all of that, but we seem to require a little bit more specificity of a district court when it imposes an increased leadership enhancement sentencing. And here, the district court said very little. And it could have said, but you're saying, by referring to the trial evidence and so on. But I'm just having a little trouble figuring out how we should assess its failure to say more than it did. Your Honor, this was a trial that the judge presided over for several weeks and also wrote a very wholesome Rule 29 decision and went through all of the facts. And at sentencing, defense counsel objected to pretty much almost every aspect of the PSR. And we had argument over almost every aspect of the PSR. And the judge certainly changed certain aspects of the PSR, did not change them with respect to the leadership enhancement area. Noted that the PSR specifically noted that he supervised five employees that were engaged in criminal conduct as well as the co-conspirator doctors. The record in and of itself is full of evidence establishing the defendant's leadership role. And while the court could have been perhaps more explicit, it is so clear in the record that the defendant was the leader that this court can overcome any deficiencies in the sentencing hearing by the overwhelming evidence establishing this leadership enhancement. So that would require the clarification of the Carter decision, where we were pretty explicit and pretty clear about this is what the, in connection with imposing a leadership enhancement, this is what the district court must say. There's so much robust evidence in the PSR. I understand that the court didn't see She doesn't refer to the PSR in open court. She refers to it after the court. And we were pretty clear about saying in open court, these are the things you've got to say. I'm just, help me navigate this. Yes. Well, the defendant challenged those areas and the court did not strike them. Even though the defendant challenged the leadership enhancement and those paragraphs in the PSR actively during the sentencing hearing, the court didn't strike those sections of it. So while it didn't affirmatively adopt it, it didn't strike those areas either. And the court, the court had all of that evidence before it and this court has the evidence from the trial transcript that shows overwhelming that the defendant was a, that the defendant was a leader. Well, Ms. Maraboli, maybe I can help you out a little bit here or at least inquire about something. There's a difference between there's evidence in the record from which we would be able to sustain a finding and a finding by the district court. Now, a minute ago, you mentioned the Rule 29 opinion. Are you saying that if we read, go back and read, because I didn't, the Rule 29 opinion, and there wasn't a sufficiency challenge the year, thankfully, and so we didn't have to read that. If we went back and read that, we would see the judge making, in effect, findings that, although not in that context, addressed to the leadership enhancement, if the judge made those findings in the Rule 29 motion, that we would find enough that those findings would clearly justify the leadership enhancement. Yes, Your Honor. Okay, so that's it. Okay. Now, can I ask you about the abusive trust enhancement? Your principal argument in the brief is not what the judge relied on for the abusive trust enhancement. Your principal argument is, it seems to me, and maybe I misread it, that Mr. James had an obligation or quasi-fiduciary obligation or position of trust vis-a-vis the insurance companies. Yes, Your Honor. Our argument is not that there was a fiduciary relationship, but that there was an abusive trust insurance company. Does that not imply that any time a crook is aware of a weakness in some institution's security system and exploits that and knows that something is not going to be checked, that he has, itso facto, occupied a position of trust because the bank or insurance company or whoever is trusting him not to exploit that weakness, as opposed to that the insurance company is just thinking, ah, it's going to cost us a lot of money to check up on every one of these things, so we're just going to take a certain amount of fraud as a cost of doing business, and we're only going to investigate to a very limited extent. There was testimony at trial that the insurance companies relied on the medical billers as well as the providers that submitted these claims to the auto adjudication system that those were accurate. What are they, idiots? I mean, they actually trusted that no one is going to try to cheat them because they realized that medical billers are a kind of quasi-professional entity that has quasi-fiduciary entrustment issues with insurance companies? I mean, they don't think that the insurance companies have any kind of fiduciary obligation to them, I can assure you of that. But this is a one-way street that everybody who submits bills to insurance companies is in a position of trust, vis-a-vis the insurance companies. Yes, in this particular circumstance, yes, the Aetna testified, Gerrit Johann from Aetna testified that Aetna, in and of itself, gets 1.4 million claims a day. That's a day for one insurance company. They can't humanly possibly go through that. Right, so I think Mr. James decides to sort of swim in that stream and hope that he's not one of the ones who gets caught, because the odds are in his favor when they're looking at 1.4 million claims a day. Why does that make him someone in a position of trust to the insurance companies? There are adversaries. Well, he used a special skill in order to bypass the controls set in that adjudication system, so that he knew how to bypass those controls so that the controls in the auto-adjudication system will catch if somebody's trying to unbundle, where it's improper to unbundle. And he knew how to bypass those controls so that he would be able to get those claims. But is resorting to one's special skills an abuse of trust? Yes. That's different. Where do I find that? Is that in the guidelines? Because the enhancement says abuse of trust or special skills. Right, and he had training. So that's what you were lost on. Right, and he had training as a medical biller, and he knew how to cheat the system through that skill. Why isn't somebody who knows that the bank is not going, if you would deposit a check in a fake account that you have forged, that the bank is not likely to catch you because there's not a human teller looking at your blatant forgery, but just a machine that may not recognize it. Is that a special skill that you know that you can get away with this or expect that you can get away with it? I think that's a different, I think that's a slightly different situation than we have here. When you talk about his training, what training was that? Did he go to graduate school? He went to BOCES, like a schooling for medical billing. And he's also a trained nurse. So he had medical training. But that tells, those are skills that you could use to legitimately bill. Did they teach you in those places how to beat the system? No. He used those skills to know, he knew the auto adjudication system. But anyway, the district court didn't rely on that anyway, right? It did not. No. So we'd have to be saying A, you're right, and B, we can overlook the fact that the judge relied on something else. So what the judge relied on was the idea that the abuse of trust was of the trust of the patients, of the doctors who gave their information for a limited purpose, which he then exploited when he did these data carving impressions of the patients when he called the insurers on their behalf, right? That's the judge's theory. On the impersonations? Yeah. I think that it was the misuse of, the abuse of trust was the misuse of their personal, yeah, their PIF. He used their information. Well, that's the only way in which he used their information in support of the crime, right? Otherwise, he just submits fake bills on their behalf, and on their behalf, on behalf of the doctor who treated them. Does that harm them in any way, or even even a dignitary damage of some kind? There is a harm. And a lot of the evidence at trial showed that a lot of the underlying medical records were also falsified. So these patients who went in for, say, a minor stitch ended up having a medical record that indicated that they had hand reconstructive surgery or something. And that can have an impact on future medical treatment. Or on their careers, as with Mr. Smart. Right. I mean, it could have it could have an impact on payments of claims in the future. It could have an impact on how medical records are viewed. So it's not just the impersonation. And the impersonations were not just they were not just oral impersonations. They were also written impersonations that made claims of physical ailments that these patients never even had. And so that does have a lasting impact on the patients as well. And that travels with them with their insurance companies, those medical records. So I guess we would decide for the poor matured restitution issues. With respect to I can start with either one if you choose, but your choice. We can start with we can start with the restitution. The government submits that the district court's restitution order was properly and conservatively calculated supported by extrinsic evidence and should be affirmed. It was conservative in the sense that the government proved that James' entire business model was based on fraud. And when calculating restitution owed to the victim's insurance company, we did not base that on James' upcoding, his staged emergency room visit, his manipulated op reports. We focused on impersonations and the modifier 59. So those were central to the fraud scheme. When you say his business model, what exactly do we mean by that? Is the idea that his comparative advantage over other billing companies that doctors could use was that he was prepared to engage in fraud on behalf of the doctors? Yes. Is that the idea? Yes, and in fact there was testimony at trial that he would, his business pitch was like, I'll make you a million dollars and then once I make you a million dollars then I'll start charging my commission. So he was enticing them to come to him and there was plenty of testimony about that, that he would make these doctors millions of dollars before even charging a commission. And was he, does the record suggest or show that he took on doctors as clients and did all of their billing?  No. So tell me what it is. Is it that he specialized in sort of like a collection agency, give me your hard cases and I'll solve them. He specialized in the out-of-network. The out-of-network. The out-of-network. Where they could charge, he could charge more and... That's where the money is. Yep. And he specialized in the, specifically the top, the largest insurance companies.  Signa, United Healthcare, and Blue Cross Blue Shield. And the doctors would, they would take photographs of the insurance cards of their patients and say, is this good insurance? And he would say, yes or no. So in other words, if a doctor had a sort of routine bill that was going to be approved on a routine basis, the doctor had a different billing service? That is correct.  Many times they used their own internal medical billers. And then they used Matthew James for these out-of-network higher claims. And... And what are the findings here? Because, I mean, I didn't get that from anything that you just said. From anything that the judge said in imposing these restitution and forfeiture amounts, indeed, as Rod pointed to, I thought the judge said not every bill that was submitted was fraudulent. Now that, again, leaves quite open whether this is a rounding error, the legitimate ones, or some significant portion. But it is something different. I mean, the judge did not use the word business model or permeate, does she? She didn't specifically use that phrase, no. But she did say that the government had done its work in calculating and put the effort into calculating this restitution figure. And there is evidence in the testimony at trial. The case agent specifically testified that the $63 million revenue was fraudulent and that the defendant's business model was fraudulent. When he was specifically asked at trial about whether or not the co-conspirator doctors were all involved, he said, I can't testify to the mindset of all of the doctors, but he adamantly testified that Matthew James's business, he was running a fraudulent business committing healthcare fraud. And that's on page, the trial transcripts at 24, 45, 46, and 22, 49. And that was in specific response to questions about the $63 million revenue of Matthew James. And as we indicated in our submission, the restitution figure was a conservative analysis. We invited the court to use a higher error rate, a margin of error that would increase that. And as I indicated, it's... What was Aetna's calculation of its loss? Aetna's  that they submitted, I don't remember, honestly, off the top of my head. It was significantly less. I think it was $50 million?  $50 million. And the restitution amount imposed for Aetna was $100 million? That sounds... That sounds right. Yes. But Aetna didn't have all of the evidence that we had. They didn't have all of the evidence of the underlying records. They didn't have... They didn't go through all of the medical records that we had that we were able to review and show to make their own calculation. They didn't interview every single patient to find out. We didn't interview every single patient. But we interviewed a significant number of the patients so that we were able to identify what patients were impersonated and what patients used modifiers. You also point out in the brief that the insurance companies apparently did not have a way of doing a computer search for records submitted by a particular biller. That's correct. As opposed to by a particular doctor. That's correct. And that was something that you could do because you came at it from the other side. You had Mr. James' records. Correct. So you knew about all of the bills that you submitted. Is that an example? Yes, exactly. What about those payments that are made before the impersonations occur? Yes. Were those part of the  investigation? They are, Your Honor. But I have a couple of comments on that. First, they're significantly small amounts compared to the amounts that are paid out after the impersonation. And the government would submit that they clearly fall within the margin of error rate that we invited the court to deduct from the total restitution amount. And let me just say with respect to Marcus Smart in particular since he was raised, he testified at trial and he  that those medical records that were submitted with respect to his hand reconstructive surgery or his hand surgery was not what actually took place. And the medical records indicated the doctor put in there that there were torn ligaments, torn tendons in his hand, and he specifically remembered that he was told by the judge that there was no torn tendon in his hand. By the doctor? By the doctor. That there was no torn tendon. So those medical records in and of themselves were falsified and manipulated. And that was what was submitted to the insurance company. And the  companies also testified, the representatives, that if they had known that the services were not rendered, they would not have paid on those claims. So they paid on a claim, before an impersonation, on a manipulated op report for services that hadn't been rendered. And so that was a fraudulent claim to be given with. Yes. Thank you very much. Just a few brief points and I'd like to start with the abuse of trust because I didn't get a chance to speak about it previously. I think as Judge Lynch pointed out, this entire, these entire transactions taking place in an atmosphere of complete distrust. Mr. Powell, hold on one second. And sorry    interrupting. I'm losing my audience.  do. They haven't done the appointment I think downstairs. They usually just listen to one argument and one argument just left. And as you can see what is on the calendar, a much shorter period of time. But you guys are all so interesting and I'm fascinated with every detail of the case. They may not be. Okay. Why don't you proceed? So this is taking place within an atmosphere of no trust whatsoever. As the government pointed out, these are out-of-network doctors. They are trying to bill as much as they can. They do not have fixed rates and the insurance companies are denying the bills or they are paying them out at a much lower rate. So both sides are essentially trying to push each other.  a negotiation. So there's no trust here. And as for the use of personal identifying information, there's a specific guidelines rule against double counting. Why is this double counting? It seems to me that what you've got here is an aggravated identity theft charge, right? Now that charge would apply if I, for example, were to purchase from some black market source your personal information and then use it in connection with a  That's what goes up. That would satisfy the elements of the offense. But if I was in a position of trust, I was your doctor and I took your personal information that you had given me for legitimate purposes and then used it to commit a fraud, wouldn't that be an aggravating factor? It's not just I'm a bad guy and I do bad things and one of the bad things I do is identity theft. It's I'm a bad guy and I do bad things and one of them is identity theft and I abuse people's trust to get that information that I use. That's a separate element that aggravates the offense, does it not? It is a separate element    Judge. The guidelines that we point to, it's the guidelines section 2B1.6 is very clear that when the use of personal identifying information is already triggering the two-year mandatory sentence under 1028A that it cannot be part of any other guideline enhancement applied on the in calculating the defendant's sentence. So we do think it's a rule against double counting. The rule against doing it is what you're  Whether it's double counting or not is my problem but if the guidelines say thou shalt not then your argument is it means what it says and it means thou shalt not. The guideline says thou shalt not and we think that's why the government didn't even argue for that below. I just want to address quickly the first step act and      government talks about the district court saying it was one of several factors. We think that's wrong.  think the court should look to A 702 where the  says I changed my mind based on the programs. That's why I changed my initial determination. We don't think it matters because we don't think the court has to reach the end of the process. We don't                       think it matters because the court has to reach the end of the process. We don't think it matters because we don't think it matters because there     is  other          because    reach the end of the process. We don't think it matters because there is no other way  reach the end of the                      because the court has to reach   the process.              end of   We don't think it matters because there is no other way reach the end of the process.  don't                  think it matters because there is no other way reach the end of the process. end of  process. don't think it matters because there is no other way    end of   the   Thank you very much. I think that is   reserve the session. Thank you